785 So.2d 1045 (2001)
STATE of Louisiana
v.
Jeff KOLOGY.
No. 00-1718.
Court of Appeal of Louisiana, Third Circuit.
May 2, 2001.
Donald D. Landry, Assistant District Attorney, Lafayette, LA, Counsel for State of Louisiana.
*1046 Robin R. Rhodes, Mercier Law Offices, Lafayette, LA, Counsel for Jeff Kology.
Court composed of HENRY L. YELVERTON, JOHN D. SAUNDERS, and JIMMIE C. PETERS, Judges.
YELVERTON, J.
The Defendant, Jeff Kology, was charged by bill of information with the misdemeanor of remaining after being forbidden in violation of Louisiana Revised Statute 14:63.3. Kology applied for writs contending that the evidence was insufficient to convict him of the crime. We granted writs for the limited purpose of calling the case up for full briefing, argument, and an opinion. We now reverse and order an acquittal.

FACTS
Carencro Middle School Principal Gill Douglass scheduled a meeting in his office on November 17, 1999, with parent Angela Lee and teacher Lorraine Perkins. Jeff Kology, the Defendant, worked for the Louisiana Association of Educators, the teachers' union, and was with Perkins representing her as her union representative. The meeting was provoked by a complaint from the parent that the teacher had not allowed her daughter to go to the bathroom, and the child had urinated on herself.
Teacher Perkins' attendance at the meeting was ordered by Principal Douglass by means of a letter stating: "There is a mandatory meeting this afternoon at 3:35 with Douglass and yourself. Please be sure you attend this meeting." Principal Douglass testified that teacher Perkins's attendance was mandated because Perkins did not attend the first meeting he had scheduled concerning this matter, and he wanted her to explain to Lee why the girl had urinated on herself.
Douglass testified that he invited them into his office where parent Lee was already present. Douglass testified that teacher Perkins introduced the union representative, Kology, to him and told him that Kology was representing her.
In the short encounter that followed, the parties never reached the subject of the child's bathroom problem. Instead, what happened was described in the testimony of the State's witness, Douglass, on direct examination:
Q. Let me stop you there. You said you invited them to come into your office. Who was it that came into your office?
A. Ms. Angela Lee, Ms. Lorraine Perkins, Jeff Kology, myself. I do not recall if her daughter was there or not. I do not recall that.
Q. So after you were in your office, what's the next thing that happened?
A. Mr. Kology went into his pocket and said, "We're going to tape this meeting." I said, "Not here. This meeting will not be taped. This meeting is over."
. . .
Q. And then what happened after you said that?
A. I told him, "You can leave now. This meeting is over." I said it three times, "This meeting is over. You may leave. This meeting is over. You may leave." And he said he wasn't leaving. So I asked my secretary, Ms. Barbara, to get me a black and white.
Q. What were you indicating when you said to Ms. Barbara to get you a black and white. What is a black and white?
A. Police car.
*1047 The "Ms. Barbara" referred to in this testimony was Barbara Forestier. She confirmed Douglass' testimony that the meeting had just begun when Douglass came out to her and asked her to get a black and white. In a statement made a short while after the incident, she said the meeting had lasted five minutes before Douglass asked her to call the police.
Angela Lee, the parent, confirmed the tape incident. She estimated that Kology left the office in ten to fifteen minutes.
The teacher, Lorraine Perkins, testified the meeting lasted between five to ten minutes. She said she and Kology met briefly in the lounge and then he left the grounds entirely.
Kology testified that five minutes elapsed from the start of the meeting until they gathered at the secretary's desk. He said they talked for about another three minutes, and then he walked off the campus.
Principal Douglass stated that it took a long time for Kology to leave. At first he said 15 minutes, then he changed that to 20 minutes.

ASSIGNMENT OF ERROR
The Defendant seeks a Jackson review, contending the State introduced insufficient evidence to uphold his conviction for remaining after being forbidden.
In State v. Lambert, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98); 720 So.2d 724, 726 this court recognized:
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See King, 436 So.2d 559, citing State v. Richardson, 425 So.2d 1228 (La.1983).
Louisiana Revised Statute 14:63.3(A) defines remaining after being forbidden as:
A. No person shall without authority go into or upon or remain in or upon or attempt to go into or upon or remain in or upon any structure, watercraft, or any other movable, or immovable property, which belongs to another, including public buildings and structures, ferries, and bridges, or any part, portion, or area thereof, after having been forbidden to do so, either orally or in writing, including by means of any sign hereinafter described, by any owner, lessee, or custodian of the property or by any other authorized person. For the purposes of this Section, the above mentioned sign means a sign or signs posted on or in the structure, watercraft, or any other movable, or immovable property, including public buildings and structures, ferries and bridges, or part, portion or area thereof, at a place or places where such sign or signs may be reasonably expected to be seen.
The statute defining the crime uses the words "remaining" and "after being forbidden." In this case, the violation, if any, was in remaining a few minutes after being asked to leave. The State proved beyond a reasonable doubt that Kology was asked to leave. The evidence shows he did *1048 leave. He left the school within minutes after he was requested to leave. The real issue, then, is whether he left fast enough.
In analyzing the sufficiency of the evidence, we considered something that our supreme court said about this statute in State v. Johnson, 381 So.2d 498 (La. 1980). They found "noteworthy ... the fact that the statute under review makes it an offense merely to remain on the premises of another following a request to leave even though the party asked to leave is creating no disturbance and his intentions may be entirely peaceable and lawful." Id. at 500. They noted that "the mere whim or wish of the owner that the other party leave, for any reason, or no reason whatsoever, gives rise to the offense if the request to leave is unheeded." Id. For these reasons, the court believed that an essential element of the offense was a warning to leave given reasonably contemporaneously prior to arrest for remaining on the premises contrary to the wishes of the owner. By the same process of reasoning, we hold that not only must there be a reasonably contemporaneous request that the defendant leave the premises, but also a defendant must be accorded a reasonable time to actually accomplish his departure.
Although the principal testified that Kology refused to leave, it appears that what he meant by that was that Kology did not get up and leave without another word. The facts are clear that Kology did not get up and leave without another word. Instead, he first inquired if the meeting could go forward without being taped. When that proposal did not get any results, he inquired if the meeting would be rescheduled.
Douglass testified that he did not want to dispose of the personnel problem at that time because the Defendant wanted to tape the meeting, and he said no. Douglass admitted that he did not give the Defendant time to put the tape recorder up or to continue the meeting without it being taped. He explained that it was because the Defendant was "taking over. He was in charge, not me."
At the same time that the principal invited Kology to leave, he also told the teacher, Perkins, that she was dismissed. This brought on a more or less private conversation between the teacher and Kology. The evidence as to this conversation was that the teacher was fearful that "dismissed" meant she was being dismissed from her job, and Kology was apprehensive that her departure might give rise to a charge of insubordination. These concerns occasioned some brief talk between Kology and the teacher in the principal's office and again in the teachers' lounge.
After ordering that there would be no taping and no meeting and that the teacher was dismissed and Kology could leave, Principal Douglass almost immediately ordered a black and white. Explaining his restraint in talking to Kology, he said: "I just did the right thing because I know my temper."
Although Principal Douglass testified that Kology refused to leave, the fact of the matter is, Kology did leave. The delayif that is the right termwas not recalcitrance because manifestly it was not inconsistent with a willingness to comply with the request that he leave. Kology's announcement that he was going to tape the meeting caused a sudden and unexpected reaction from the principal that immediately changed everybody's plans for the afternoon. In the ordinary course of human experience, adjustment to such an abrupt change takes a little time. Some things simply had to be done. It was not criminal for Kology to ask if the meeting could go forward without taping, nor was it *1049 criminal for him to ask if the meeting would be rescheduled. It was understandable and reasonable under the circumstances that Kology would make some effort to get the principal to change his mind. Not being successful in that effort, it was not inappropriate for Kology to take a minute to console his client. It was necessary that he put the tape recorder into his briefcase and close his briefcase. There was no threat of violence, no risk to students (school was out for the day), no reason why Kology would not be allowed to take his leave with dignity. There was no apparent need to use other than normal, ordinary, or deliberate steps in effectuating the departure.
We recognize that the statute would lose its force altogether if a demand or request to leave need not be met with expedition, and that whether or not a response is quick enough is a question for the trier of fact. However, in this case, the evidence of his response is not in doubt. By all accounts, he left within minutes and with reasonable alacrity. Our holding is that the circumstances of this case fall short of establishing beyond a reasonable doubt that Kology harbored an intent to commit the crime of remaining after being forbidden.
The Defendant's conviction is reversed, and the sentence vacated.
CONVICTION REVERSED.